I'm afraid you get to hear from me one more time today. All right, Mr. Subbaraman, we'll hear from you on the Hilliard case. May it please the Court, my name is... Wait a minute until Mr. Moss is ready there. He's just getting set up. Oh, I'm sorry. I apologize, Your Honor. All right, you may proceed. May it please the Court, my name is Mahesha Subbaraman, and it is my privilege to represent Plaintiff Appellant Thomas Hilliard. This appeal concerns both the merits of a Social Security ALJ decision and an Appointments Clause claim. I'm going to focus on the merits unless the panel has further questions about the Appointments Clause issue. The ALJ in this case erred in two ways that warrant reversal. First, the ALJ did not provide sufficient reasons to justify his weighting of the physician testimony in the record. And second, the ALJ's residual functional capacity determination failed to properly account for Hilliard's substantial limitations with respect to reading, writing, and arithmetic. First, speaking to the issue of the weighting of physician testimony, the ALJ made a residual functional capacity determination that Hilliard could perform standing and walking of a light exertional level. And looking at the ALJ's determination, it's pretty clear that it tracks what one of the non-treating consultative experts, Dr. Dennis Weiss, advised in terms of saying that Mr. Hilliard could probably stand or walk with normal breaks for a total of about six hours in an eight-hour workday. Now, the district court, in looking at this analysis, says, granted, the ALJ stated that he gave significant weight to the opinions of the non-treating consultants while giving partial weight to the opinion of the treating consultant, but I don't think that that's a big deal because it seemed to be a well-reasoned decision. The reason that's a problem, Your Honors, is because substantial evidence does not support the ALJ's conclusion. We're focusing here on two treating physicians who actually examined Mr. Hilliard, Dr. Barzani and Mr. Uredin. And Dr. Barzani treated Mr. Hilliard on June 16, 2015, and he found, contrary to Dr. Weiss's determination, that Mr. Hilliard could tolerate only about a half an hour of standing and moving about and for walking was similarly impaired. All the other doctors say that Dr. Barzani's opinion just conflicts with everything in the record. They're very straight about it. But the odd thing is that, Your Honor, the other opinions in the record don't align with the fact that Mr. Hilliard had a total hip replacement less than three or four months after Dr. Barzani said that this is an individual of very limited capacity. So if you're asking the question, whose diagnosis here makes more sense in terms of this particular Social Security claimant, certainly the physician who's saying very limited capacity prior to what is a necessary total hip replacement aligns more than saying that, essentially, that Mr. Hilliard could kind of dance the tango. I mean, that's the problem we have here. I thought post-surgery it was normal strength, normal range of movement. I think everybody says that, right? Immediately post-surgery, to be sure, there was even, I think Mr. Hilliard was reporting that he was feeling a little bit better. But there's additional evidence in the record after that. On March 21, 2016, Mr. Hilliard complained that he had severe right leg pain. It took him to the ER. That's a transcript record, 10-15 to 10-18. And then April 28, 2016, he complained about back and limb pain to Mr. Uredin. That's a transcript record, 10-77. So like with many medical procedures, you have them, you feel good for a short period of time, but then new complications arise. And the bottom line is that Dr. Weiss's analysis did not accord with the total hip replacement that proved to be necessary afterwards and certainly did not reflect the experience in the months following the hip replacement. So for the ALJ in this case to give substantial weight to physicians who never treated or saw Mr. Hilliard and to discredit or at least devalue the testimony of Dr. Barzani and Mr. Uredin, whose evaluation of Mr. Hilliard aligned with what he ultimately needed in terms of medical treatment, that's problematic under this Court's jurisprudence in cases like Jenksons v. Apfel, where the Court says a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. And here we have the ALJ just giving it partial weight over the opinions of physicians who didn't treat Mr. Hilliard and whose diagnoses don't jive with his actual physical condition. With that, Your Honors, I'm going to move quickly over to the reading-writing arithmetic limitations. The ALJ in this case found that Mr. Hilliard could be employed as a fast food worker as that work is generally performed. Substantial evidence did not support this conclusion. Throughout the record, you have testimony from Mr. Hilliard and conclusions from various doctors and a reading test administered by a literacy center establishing that Mr. Hilliard had very limited capacity in the area of reading, writing, and math. For example, at transcript record 345, you have a literacy test that put Mr. Hilliard at the middle second grade level in terms of his reading skills. At transcript record 43, Mr. Hilliard testified that he couldn't fill out the Social Security forms in this case on his own. His wife had to fill them out. And when he was asked the question, has that ever been a problem for you, he said, yeah, it's been a problem for me in some of the jobs that I've had. At transcript record 46, he speaks to a job he had at Dollar General, and he says, I only had that job for a short time. I couldn't count the money right. So given all of that testimony in the record, for the ALJ in this case to conclude that Mr. Hilliard could perform the work of a fast food worker is particularly problematic. And what compounds the problem even further is the fact that these deficits are especially important here because of Mr. Hilliard's physical limitations. You know, most jobs have a physical component, and they have a mental component. And when you can't do the physical component, then the mental component matters even more. And so as a result, the ALJ here was really obligated to develop the record to make sure that this job as generally performed was one that Mr. Hilliard could do. What about him doing the fast food work for eight or nine years or however long? It's certainly the case that he had prior experience, but the ALJ also found that he couldn't do the work as he had actually performed it in previous years due to the new physical limitations that he had developed during the intervening period. So the physical component of that work was out. All that really could be left was the mental labor involved. And the Dictionary of Occupational Titles says that to do fast food work in a general manner, you need a passive vocabulary of 5,000 to 6,000 words, a reading rate of 190 to 250 words per minute, and math skills that are fairly complex in nature. And the ALJ never considered that as part of his decision, and he never raised it to the vocational expert in obtaining the vocational expert's determination as to whether or not this was a job that Mr. Hilliard could generally perform. And under this Court's decision in Standard v. Commissioner from 2018, if a vocational expert's testimony appears to conflict with what the Dictionary of Occupational Titles lists, the ALJ has to identify and resolve the conflict. And here, the ALJ simply did not do that. I see I'm into my rebuttal time, and I'd like to reserve. I don't know that you are, but you may reserve. The yellow light hadn't gone on, but you're welcome to reserve. That's fine. Thank you. All right, Mr. Moss, we'll hear from you. May it please the Court? Good morning. My name is Michael Moss, and I represent the Social Security Commissioner, Andrew Saul. Also seated with me today, as you know, is my co-counsel, Daniel Aguilar, who is there just in case the Court wanted to hear more on the Appointment Clause issue. I would like to first respond to a few things that opposing counsel stated. First, two things he misstated. Neither Dr. Barazanzi nor Mr. Yurden qualified as a treating physician. Right off the bat, he referred to them as two treating physicians. By definition, Dr. Barazanzi cannot be a treating physician because he was a one-time consulting examiner, did not have any treatment relationship whatsoever with Hilliard. Although Mr. Yurden, as a physician assistant, did serve and treat Mr. Hilliard as a physician assistant, he did not qualify as an acceptable medical source and therefore could not qualify as a treating source, and any opinion he offered could not qualify as a medical opinion. Further, as an— But it can have weight depending on the circumstances of the case. Your regulations clearly say that. Absolutely, Your Honor. And the ALJ acknowledged that and considered that evidence. The ALJ just first pointed out that he was not an acceptable medical source, and that does affect his ability to offer a medical opinion, and he cannot also establish the existence of an impairment. Now, with Dr. Barazanzi, I'd like to also point the Court to one key thing that he did allude to in his report. He specifically included a statement in his report that the performance during the exam and the effort can affect the test results. Now, he did not say that he believed there was any malingering or anything, but he did include that statement, but I think that statement's important in light of Nurse Howard's January 2015 statement in her— in the treatment records that Hilliard arrived at the doctor's appointment, hunched over, walking slowly with a cane. After his miracle treatment, he walked back out the door without using the cane at all, standing upright, walking briskly. Clear evidence that he may not have been completely forthcoming with the symptomology. Who said that? Who testified to that? I'm sorry? Who testified to that? That was Nurse Melanie Howard in her January 2015 treatment record, and that's in our brief. I believe it's in the medical summary as well as in the argument. And so that raises the issue that Dr. Berzangi clarified and qualified his opinion that it was based on a one-time examination that was completely dependent on Hilliard's effort and what Hilliard basically demonstrated he could perform. Now, the real issue from Dr. Berzangi's report was Berzangi's opinion that he could only walk and stand or stand for half an hour and walk for one to two blocks. It's important to note that Dr. Berzangi found that he could lift up to 30 pounds and that he could also perform unlimited sitting. So really we're just looking at the standing and walking limitation. That is why Nurse Howard's observation of him standing and walking goes directly to that. It's also important, as the court noted in the opposing counsel's argument, that following his right hip replacement in October of 2015, his own orthopedic surgeon two months later in December stated that he was doing quite well and Hilliard reported that he was, quote, very happy with the results and that he was walking up to five blocks per day two months after the hip replacement. It's also important to note the timing of Mr. Yerden's report. May 17, 2017, five days before the hearing. Clearly a fill-in-the-blank opinion from a non-acceptable medical source obtained for the hearing to bolster his claim. Now, as I acknowledged, as we addressed, Mr. Yerden could provide good evidence of limitations and the commissioner does not deny that, but that evidence is overcome by the evidence from the two state agency experts, Dr. Weiss and Dr. Burns, who, although they did not examine or treat Hilliard, they are experts and they did review his records, including Dr. Barazangi's report, and explicitly found that Dr. Barazangi was wrong with the walking and standing limitations and that there was not a need for him to use a cane. So, therefore, the commissioner submits that substantial evidence supports the ALJ's weighing of the medical evidence and, again, although it was Hilliard's burden to prove his functional limitations, not the ALJ's burden to prove his functional capabilities, it was the ALJ's role to assess his RFC. And as this court has repeatedly acknowledged, the court should defer to the ALJ's findings and the substantial evidence standard, as the Supreme Court recently reminded us this year in BSTEC, is not a high threshold. The commissioner does not have to show that preponderance of the evidence supports the ALJ's findings. Substantial evidence clearly supports the ALJ's weighing of the opinion evidence. Now, with regard to the second issue, the reading, writing, and math limitations alleged, I first want to address the math limitations because Hilliard testified that he was in special education for reading and writing only and was in regular classes for everything else, including math, and graduated from high school, obviously, therefore, in regular math. He also testified that he was able to handle finances and a checkbook. Therefore, there's really minimal evidence that seems to have been evolving during the court litigation of a math issue. What about this business that he couldn't count the change at the Dollar General if he could handle finances and a checkbook? He also reported that he had trouble working the cash register when he was at McDonald's and Burger King. But it's important to note that when he left those jobs, he wasn't fired. He quit because he moved with his sister to a different state. And so, again, the math level requirement and the reading and language, the math and the language requirements, are the second lowest levels that the DOT addresses for the fast food worker job. I thought second grade reading is not sufficient for a normal fast food worker. I thought you thought the Social Security Administration thought that, too. Well, Your Honor, that would be a great argument for Hilliard to raise in a Step 5 case. It's pure speculation of a job that hasn't been performed. But the more relevant evidence here, as the court acknowledged, Hilliard performed this exact job for nine years, and it wasn't for one employer, it was for two employers. And in his reply brief, Hilliard raises speculation that perhaps he was accommodated by an employer who allowed him to do less of the reading and writing and do more of the heavier lifting, consistent with his testimony that he lifted up to 30 pounds, which was the only reason that the ALJ's RFC prevented him from going back to it as actually performed, because the ALJ took him at his testimony that he had lifted up to 30 pounds. Now, he may have genuinely believed that, but that's based on his memory of, well, how heavy were those boxes? Now, he is able to perform the job because he did it for nine years. And the pure speculation that he may have been accommodated, you know, fails for five reasons. First of all, he performed it for nine years at two large institutional employers, McDonald's and Burger King. He provided no evidence of any such accommodation or altering of the job requirements. He also, at third, he admitted his duties included ordering stock, taking orders, and working the cash register, all of which required some ability to read, count, and use forms. And he also testified that the sole reason he could not perform this job was because of the physical standing and lifting requirements. Also, it's important to note that although the ALJ did not make an alternative Step 5 finding, the ALJ did elicit the testimony from the vocational expert to support such a finding. And the vocational expert testified that with his RFC, he could also perform five additional jobs, collator, operator, vending machine attendant, produce weigher, and document preparer. And this is important because three of those five jobs only require math level one and language level one. So even if he could only perform math and language level one, there's no evidence he couldn't perform those other three jobs. And it's also, again, the commissioner submits that he performed this job for nine years, and the vocational expert heard the testimony about his reading and writing difficulties, knew his educational level, and took that into consideration before testifying that he could perform this job. And so, again, the commissioner submits that Hilliard's mere speculation is insufficient in this case and that the court, therefore, should deny his appeal and affirm the district court's judgment. And I see my time's up. Thank you for your argument, Mr. Moss. Thank you. Mr. Subbaraman, we'll hear from you in rebuttal. So I have basically three simple points to make on rebuttal. First, listening to opposing counsel's presentation before the court, I hear opposing counsel essentially trying to do two things. One, rewrite the ALJ decision so that it conforms with what the commissioner today would like that decision to read, and two, importing a host of credibility determinations about various things that Mr. Hilliard attested to that are not in the ALJ decision. So, for example, when opposing counsel takes issue with Mr. Hilliard's use of a cane at certain points and non-use of a cane at other points, I don't see any of that in the ALJ decision, which then I think speaks to the broader issue here, which is that the agency is grasping for straws and attempting to justify what the ALJ decided actually here. Did the ALJ say anything about malingering? I'm sorry, Your Honor? Did the ALJ say anything about malingering? I don't believe so, Your Honor, but it's been a while since I've looked word for word at the decision. I don't believe there was anything about malingering in the ALJ decision. I was the point made about the cane, so if there was something said about malingering, then that would be consistent with the argument. I don't believe that there was anything about malingering in the decision, but that's my best recollection at this point in time. Go ahead. So then that kind of brings me to my second point, which is that throughout my opposing counsel's presentation, he could not square the circle of the agency's experts saying that Mr. Hilliard could do all these things and then three months later needing a total hip replacement, and that's ultimately kind of the nub of this issue in terms of giving comparative weight to agency experts who have never seen Mr. Hilliard and physicians who did see Mr. Hilliard, whether it was for one occasion or, in the case of Mr. Uredin, continuously or somewhat continuously since 2014. This Court's precedents are clear that treating a physician who sees a patient, that their testimony should be given more weight. And then that kind of leads to the third and final point, which I think builds off of your point, Judge Benton, that Mr. Hilliard is an individual with a second grade reading level. There's no way he could perform the work that the vocational expert in this case said that he could, and the ALJ, by failing to frame that issue properly to the vocational expert, ultimately rendered a decision that was not supported by substantial evidence. And for those reasons, we respectfully submit that you should reverse. Very well. Thank you. Thank you for your argument.